No. 24,872.

THE STATE OF KANSAS, *ex rel.* CHARLES B. GRIFFITH, Attorney-general, *Plaintiff*, v. THE BOARD OF COUNTY COMMISSIONERS OF LINN COUNTY et al., *Defendants.*

### SYLLABUS BY THE COURT.

1. MANDAMUS—*Contract for Construction of Bridge—Federal Aid Granted—Contract May Not Be Revoked—Duty of County Officials.* Where a highway is being improved, federal aid being granted for the purpose, and a contract is entered into by the county for the construction of a bridge thereon costing over $2,000 and therefore requiring to be constructed under the bridge law, the county commissioners are under a duty to carry out such contract which they cannot escape by undertaking to revoke it, provided the necessary steps were taken to give it validity.

2. SAME—*Action to Require Public Officer to Perform Official Duty—State Proper Party Plaintiff.* The state is a proper plaintiff in an action to require a public officer to perform a duty resting upon him in that capacity, and need not show any specific injury resulting to the public from its nonperformance in order to maintain such an action.

3. BRIDGE CONTRACTS—*Duty of County Attorney to Indorse and Approve Bridge Contracts.* Under a statute requiring a county attorney to indorse his approval upon a contract entered into by the county commissioners if he finds it to be valid, the question of its validity being one of law, he may be required by mandamus to make such indorsement if the court determines it to be his duty, notwithstanding his own judgment to the contrary. And if his term of office expires leaving such duty unperformed it may be required of his successor.

4. SAME—*No Valid Objection to Carrying Out Bridge Contract.* It is not a valid objection to the granting of a writ of mandamus requiring the carrying out of a contract by county officers that the enforcement of the writ will involve the control by the court of a series of acts and to some extent of continuous conduct.

5. SAME—*Valid Bridge Contracts.* Various objections to the validity of con-
tracts for the construction of a number of bridges on a county road under-
going improvement with federal aid are held not to be well taken.

Original proceedings in mandamus. Opinion filed March 22, 1923. Judg-
ment for the plaintiff.

*Charles B. Griffith,* attorney-general, *John F. Rhodes,* assistant attorney-
general, *Charles F. Trinkle,* of La Cygne, and *John A. Hall,* of Pleasanton,
for the plaintiff.

*John O. Morse,* of Mound City, and *W. W. Edeburn,* county attorney, for
the defendants.

The opinion of the court was delivered by

MASON, J.: On December 28, 1922, the board of county commis-
sioners of Linn county entered into contracts for the construction of
three bridges. On January 8, 1923, a change having taken place in
the membership, the board passed a resolution declaring that the
contracts were not binding and that the board as previously consti-
tuted had no power to make various orders leading up to them, and
undertaking to revoke such orders and contracts. On February 20,
1923, the state, upon the relation of the attorney-general, brought in
this court the present proceeding against the commissioners, the
county clerk and county attorney being joined as defendants, seek-
ing by mandamus to require the recognition and carrying out of the
bridge contracts.

1. Two of the commissioners and the county attorney (who will
be spoken of as the defendants) resist the order sought, and while
assailing the validity of the bridge contracts upon various grounds
contend that, even assuming them to have been binding when made,
the board, having a wide discretion in the conduct of the business af-
fairs of the county, may elect to refuse performance, preferring to
subject the county to whatever liability may result from the breach
of contract rather than to pursue a policy which it regards as con-
trary to the public interest. There are some situations in which the
courts will not interfere to prevent the breaking of a contract by a
public body. (*Whitlow v. Board of Education,* 108 Kan. 604, 196
Pac. 772; *Construction Co. v. Sedgwick County,* 100 Kan. 394, 164
Pac. 281.) Here, however, this situation is presented: The bridges
in question are situated upon a highway which is a part of a federal-
aid road project. The road has been petitioned for, found by the
county board to be of public utility, and partly constructed. The

county is under an express obligation to build the road and under a clearly implied obligation to provide the bridges, which are necessary to its usefulness. The road statute includes a provision that "All bridges costing less than $2,000 and having a span of less than twenty feet, shall be included as a part of the improvement and the cost thereof apportioned as herein provided." (Laws 1917, ch. 265, § 11.) The necessary implication is that the bridges here involved, each of which will cost more than that amount, must "be built at the expense of the county under the general bridge law." (*The State, ex rel., v. Raub,* 106 Kan. 196, 204, 186 Pac. 989.) Although to procure the erection of these bridges it is necessary to have recourse to other statutes, they are essential to the effectiveness of the road project and cannot be treated as though they had no connection with it. It is our judgment that in these circumstances the new board is under a legal obligation to carry out the contracts for the construction of the bridges if the preliminary steps necessary thereto were properly taken, and that this obligation cannot be annulled by an attempt at revocation. The resolution undertaking such annulment gave as a reason for it the want of power in the previous board to do a number of things leading up to the making of the contracts. The right of the present body to disregard them must be determined by the sufficiency of any objection to the validity of the various acts of the prior board, which for the most part turn upon contested points of law which may be finally decided in this action.

2. The defendants suggest that even if the contracts are binding upon them the contractors are the only persons entitled to complain of their refusal to carry it out, and that the state is not a proper plaintiff. From what has already been said the interest of the public sufficiently appears, but the courts at the instance of the state will constrain a public officer to perform any duty imposed upon him by law, merely because of the existence of the legal obligation, without requiring a showing of any specific injury to the public from its nonperformance. (*The State v. Lawrence,* 80 Kan. 707, 103 Pac. 839; *The State, ex rel., v. Doane,* 98 Kan. 435, 158 Pac. 38.)

3. The bridge statute contains this provision:

"That it is hereby made the duty of the county attorney to personally examine as to form, the advertisement, proposal, contract, plans, specifications, bond and the minutes of the board's meeting for each bridge or culvert proposed to be built or repaired by contract, to determine whether the contract

has been awarded in strict compliance with this act; and no contract shall be legal and binding on the county until said contract is signed by the chairman of the board of county commissioners, by order of said board at a legal meeting thereof, and approved by the county attorney by his signature indorsed thereon." (Laws 1917, ch. 80, § 18.)

The occupant of the office of county attorney at the time the contracts were executed did not believe that the bridge laws had been complied with and made an indorsement upon each to that effect. The defendants urge that it was incumbent upon the officer to act upon his own judgment and that his action cannot be controlled by mandamus, and that in any event the present county attorney has no duty to perform in the matter. The obvious intention of the statute is that the county attorney shall pass upon the legality of the proceedings involved, and not upon any question of business expediency. Where, as here, the problem is one of applying the law to established facts, an officer who must in the first instance pass upon the question may be required to take another course where the court reaches a different conclusion upon the legal issue. For illustration, mandamus will lie to require the auditor of state to allow a claim in spite of his prior disapproval, where it was based upon what is found to be a mistaken view of the law. "Where they [the defendants in mandamus] seek to justify nonaction on their part solely by a reason which is founded upon a doubtful conception of their legal obligations—where the controversy grows out of a dispute over a pure question of law, an authoritative answer to which will necessarily end the matter—the practice in this state is to permit the issue to be determined in mandamus. . . ." (*Construction Co. v. Sedgwick County,* 100 Kan. 394, 396, 164 Pac. 281.) An unperformed duty which, when his term expired, rested upon the former county attorney to approve the bridge contracts would devolve upon his successor. The matter of demand and refusal is immaterial when the new officer contests his obligation upon the merits.

4. In behalf of the county commissioners, the objection is made that the specific duty at present incumbent on them is not pointed out. It is sometimes said that a court will not undertake by mandamus to control a general course of official conduct through a long series of continuous acts (18 R. C. L. 119), but in this state the writ is used where a series of acts and continuous conduct are involved. (*City of Potwin Place v. Topeka Rly. Co.,* 51 Kan. 609, 33 Pac. 309; *The State, ex rel., v. Railway Co.,* 87 Kan. 348, 364-5, 125 Pac. 98.)

The defendants at present are proceeding upon the theory that the bridge contracts are invalid. We assume if the court reaches a contrary conclusion whatever action is necessary to carry them out will be duly taken. If the fact should prove otherwise orders can be issued for various specific acts as the occasion may arise.

5. The defendants assert that the former board failed to comply with the following provisions of the statute:

"That whenever the board of county commissioners of any county be of the opinion that it is necessary to construct or repair any county bridge or culvert it shall determine in what manner the same shall be built or repaired, and shall direct the county engineer to prepare complete plans for the same, and after the approved plans and specifications have been filed and before the notice of the letting is published the county engineer shall make and furnish to the board an accurate sworn estimate of the cost of the construction or repair of the same; . . ." (Laws 1917, ch. 80, § 5.)

"Before the levies are finally determined upon the county board shall hold a public meeting and hear protests, if any, against the said levies and the said bridge and culvert improvements contemplated: *Provided,* That notice of such hearing shall be published in two consecutive issues of the official county paper at least ten days prior to the date of such meeting, which notice shall contain the following information, to wit: The location of each bridge and culvert which the board proposes to repair; the character of repairs to be made, and the estimated amount of money necessary to repair each such structure; the location, the type, the materials to be used in construction, and the estimated cost of each new structure, and the time and place of such meeting; but failure to publish the notice or hold the public meeting herein required shall in no wise vitiate the levies authorized by this section. After the termination of the hearing the county board shall make an order and spread the same upon the journal of its proceedings, stating the exact location of the bridges and culverts to be constructed and repaired, the character of the construction and repairs contemplated, and the amount of money to be appropriated for such bridge and culverts. The board of county commissioners at the time prescribed by law for levying county taxes shall levy a tax of not more than one and one-half mills on the dollar on all taxable property in the county, to be collected as other taxes, and when collected shall be expended for the repair and construction of bridges and culverts. The board of county commissioners shall not be prohibited from using bridge funds on other bridges than the ones designated when in their judgment necessary." (Laws 1919, ch. 98, § 1.)

Inasmuch as the law specifically states that "failure to publish the notice or hold the public meeting herein required shall in no wise vitiate the levies authorized by this section" the provisions with reference thereto must be regarded as directory only.

On April 11, 1921, the commissioners entered into a contract with a Topeka engineer to make surveys, plans and specifications and

estimates for grading and surfacing the road, including all drainage structures, special reference being made to bridges costing over $2,000, blue prints to be furnished, approved by the state highway commission.

In the resolution of the county commissioners, adopted April 25, 1921, declaring the improvement of the road petitioned for to be of public utility, there was inserted a paragraph that the board should cause the construction of all necessary bridges on such road, costing more than $2,000, to be paid for out of the county bridge fund with the assistance of such federal aid as might be granted. The defendants regard this action with respect to bridges as ineffectual because incorporated in the resolution as to the utility of the road. We do not think its being acted on in conjunction with the road matter would impair such effect as it would otherwise have.

The county board does not appear to have determined in June, 1922, the number and kind of bridges to be built in the ensuing year, nor to have given the county engineer a list thereof. In July of that year, however, the engineer submitted a bridge budget including a list of abutments and piers on bridges on the road referred to, estimated to cost $114,964.22, the county's share being stated at $57,482.22, allowing for federal aid, the total estimates for other bridge work amounting to $18,460. On August 9, 1922, a county bridge tax was levied of one and one-half mills on the dollar. On September 5, 1922, the board adopted a resolution in recognition of the grant of federal aid concluding as follows:

"It is further agreed that, as soon as funds to construct the remainder of the bridge work forming a part of the plans of the proposed improvement can be secured by county levies, with the federal aid that may become available, the Board of County Commissioners will proceed with the completion of said bridge work. Further resolved that the board pledges the good faith of Linn County, Kansas, to carry out the foregoing conditions and to finally complete this improvement as called for in the Benefit District Petition which they have accepted and approved for this project."

On November 17, 1922, the county engineer received from the state highway engineer's office detailed estimates of the cost of the three bridges here under consideration (bearing the approval of the state highway engineer) to each of which he attached his affidavit that it was accurate to the best of his knowledge and belief, filing them with the county clerk. On the same day an order was entered on the journal appropriating for these bridges and another one "as much as may be necessary after the deduction of federal aid, of the

The State, *ex rel.*, v. Linn County.

bridge fund now on hand, and so much as may be necessary, after deduction of federal aid, of the bridge fund to be raised from the incoming and present bridge fund tax levies." On November 23, 1922, the county board passed a resolution declaring it necessary to construct the three bridges, reciting that the exact location, dimensions and specifications were more specifically shown by the plat, plans and specifications of the road on file with the county clerk, and approving such plats, plans, specifications and estimates. While the letter of the statute was not followed with exactness, we conclude that there was a substantial compliance with its essential provisions; that the engineer's bridge budget was a sufficient basis for the tax levy; that the county engineer's verification of the estimates received from the office of the state highway engineer amounted to the adoption by him of the estimates and the plans and specifications on which they were based; that the reference in the resolution spread upon the journal to the plans and specifications as on file with the clerk was equivalent to stating the exact location of the bridges and the character of the construction contemplated; and that the estimates indicated the amount of money appropriated for each bridge.

The statute provides that whenever it is necessary to construct a bridge ("the county engineer's estimated cost of which does not exceed $40,000") on a county road the board shall appropriate from the county bridge fund a sum sufficient to meet the entire expense of such work. (Laws 1920, ch. 8, § 1.) The defendants contend that this provision requires the amount to be expended to be on hand at the time the appropriation is made. The word appropriate is often used to describe the setting apart to a specific purpose of money to be raised by taxation, which has not yet been collected, and we see no reason why it should not be interpreted here in accordance with that usage.

The statute provides for the submission to popular vote of a proposition to construct a bridge "the cost of which shall exceed" $40,000. (Laws 1920, ch. 8, § 2.) The estimate of one of the bridges here involved contained these figures:

"Total cost (to be used in considering bids on work)... $37,245.76
10% engineering and contingencies (on F. A. projects
only) .......................................... 3,724.58

Grand total (on F. A. projects only)............ $40,970.34"

The defendants argue that this bridge could not be built without a

vote of the people. The plaintiff rejoins that the federal aid would reduce the expense to the county by one-half, but that in any event the bridge is not in the $40,000 class because the estimate to be used in considering bids was less than that amount and the bid which was accepted and upon which the contract was let was $35,455.38. The statute makes a vote of the people necessary in the case of a bridge "the cost of which" shall exceed $40,000. The estimated cost "to be used in considering bids on work" was $37,345.76, and the contract was let for $35,455.38. Moreover, the cost to the county would only be half of that, by reason of federal aid. Under statutes having a similar purpose contributions from outside sources have been considered and allowed for (*Wright v. Board of Education*, 106 Kan. 469, 188 Pac. 439, and cases there cited), and certainly federal aid apportioned to a road project may be treated as money definitely available. We think in the situation presented no election was necessary.

The statute in relation to the public opening of sealed bids includes these provisions:

"All bids shall be considered, and accepted or rejected. In case the work is let at such public letting, contract shall be awarded to the lowest responsible bidder, or the board may, if it deems the proposals too high, reject all bids and readvertise the work as before, or it may let the work privately by submitting the contract, with a statement of the reasons for rejecting the bids at the public letting, to the State Highway Commission for approval: *Provided*, That no contract shall be let at an amount exceeding the county engineer's estimated cost or at a higher price than the lowest responsible bid received at the public letting." (Laws 1917, ch. 80, § 15.)

The commissioners' journal of December 16, 1922, contains a recital that all the bids on two of the bridges were rejected on the ground that they were above the engineer's estimate. But resolutions are shown in the later proceedings of the same day for the letting of contracts on both bridges at the engineer's estimates— "to be used in considering bids on work"—($25,349.29 and $17,-684.63, respectively), and by recitals in the contracts it is shown that these were the amounts bid by the respective contractors. It appears from the record, therefore, that notwithstanding the bids were at first rejected two were later accepted; moreover, it is set out in an agreed statement that these bids were accepted. An entry in the journal of December 28, 1922, of a resolution for entering into a contract for one of these bridges and the third one uses the

phrase "as per bids accepted and private awards made Dec. 16, 1922," but this does not change the character of the transaction, which was an acceptance of the proposals made.

The statute provides that "within ten (10) days after any public letting the bidder to whom any contract shall be awarded shall enter into contract with the board of county commissioners." The letting was held December 16, 1922. The contracts were entered into December 28, 1922, and January 2, 1923. We do not regard the delay as vitiating the contracts.

The defendants urge that the board of commissioners as it existed in 1922 could not by entering into these bridge contracts control the action of the board after January 8, 1923, the date at which the term of an old member expired and a new one began. There are situations and classes of contracts to which that rule is applicable. We think it unnecessary to enter into a detailed discussion of the matter. We regard it as quite obvious that if a contract of the character of those here involved is valid at all it is binding upon the county, and upon the board of county commissioners as a continuing body representing the county, notwithstanding any changes in its membership.

The defendants assert that the enforcement of the bridge contracts should not be ordered because sufficient money is not available in the bridge fund to meet the expense. They suggest that the evidence does not make it certain that the federal government will pay half the cost of the bridges—that the county is not bound by the records of the state highway commission. The fact of the allowance of federal aid by agreement of the state highway commission and the secretary of agriculture is shown, and it is not material whether it has been made of record in the office of the county clerk. The total contract cost of the three bridges in question is $78,489.30. The county's share is reduced by federal aid to $39,244.65. Another bridge costing $11,552.94, on which federal aid has been allowed, brings the total county expense for the four bridges to $45,021.12. There was in the bridge fund October 1, 1922, $25,100.06, of which $7,223.81 has been expended. The one and one-half mill tax levy of August, 1922, will produce $36,104,41, so that there is at present a fund of $53,980.66 in sight. There is also a balance of $2,238.11 in the state aid fund, the two making a total of $56,218.77. If these figures were all that were to be considered there would be a surplus of

$11,197.65. The defendants, however, compute in round numbers $16,000 as necessary to keep county bridges in safe condition during the year, according to the budget and testimony of the county engineer. There is of course a reasonable probability of additions to the state aid fund. And the repairs may not require payment of the full amount of the estimate within the year. We do not think the contracts are vitiated by the difference between the total demands and the available resources. The defendants, however, urge that two other items should enter into the computation. The statute relating to the bridge levy provides for the addition of 20 per cent to the estimate, for a contingent bridge fund—or for such a levy as to bring the contingent fund up to 20 per cent of the estimate. (Laws 1919, ch. 98, § 1.) It does not appear that in fact any contingent fund has been maintained; nor is it clear that a contingent fund might not be used to meet such a situation as that here presented. We do not think the fund which may be looked to to meet the county's obligations for the bridges in question requires to be diminished in order to preserve or create a contingent fund. The estimates for the bridges contained an allowance of 10 per cent for engineering and contingencies, and the defendants contend that this should be added to the amounts named in the contracts. That addition is in part to provide a margin of safety and the portion likely to be drawn upon is more or less indefinite. We do not think the contracts are invalidated by the absence of funds on hand or included in a present levy sufficient to meet at once this and the other obligations referred to.

The defendants further urge that the writ ought not to issue because the plaintiff has not shown that the county has a right of way at several places where the road is located. The objections made to the county's title do not appear to be well taken, but in any event they would not invalidate the bridge contracts.

Judgment is rendered for the plaintiff declaring the contracts valid and requiring the county attorney to endorse his approval upon them. Jurisdiction will be retained for the purpose of making further orders should they become necessary.